**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| SEVERO M.,[1]<br><br>              Plaintiff,<br><br>      v.<br><br>FRANK BISIGNANO, Commissioner of Social Security,<br><br>              Defendant. | Case No. CV 25-04320-AS<br><br>**MEMORANDUM OPINION** |

     For the reasons discussed below, the decision of the Commissioner is affirmed.

---

     [1]    Plaintiff's name is partly redacted in accordance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

**PROCEEDINGS**

On May 13, 2025, Plaintiff filed a Complaint seeking review of the Commissioner's denial of Plaintiff's application for supplemental security income ("SSI") under Title XVI of the Social Security Act. (Dkt. No. 1). On July 17, 2025, Defendant filed an Answer consisting of the Administrative Record ("AR"). (Dkt. No. 11). The parties subsequently filed opposing briefs setting forth their respective positions regarding Plaintiff's claims ("Pl. Brief," and "Def. Brief"). (Dkt Nos. 14, 16). The parties have consented to proceed before a United States Magistrate Judge. (Dkt. Nos. 8-9).

The Court has taken this matter under submission without oral argument. <u>See</u> C.D. Cal. C. R. 7-15.

**BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION**

On September 22, 2022, Plaintiff filed an application for SSI under Title XVI of the Social Security Act. (AR 206-15). He alleged disability since March 8, 2021,[2] based on autoimmune vasculitis, type two diabetes, and depression. (AR 206, 236). Plaintiff's application was denied, initially on January 9, 2023, and on reconsideration on September 28, 2023. (AR 88-113). Plaintiff then

---

[2] Plaintiff previously applied for and was denied disability benefits through March 18, 2020, and again through January 20, 2022. <u>See</u> AR 65-87 (denying benefits on initial review of two separate applications).

requested a hearing before an Administrative Law Judge ("ALJ"). (AR 129). On April 30, 2024, ALJ David Lacy held a telephonic hearing and heard testimony from Plaintiff, who was represented by counsel, and vocational expert ("VE") Jane Colvin-Roberson. (AR 36-64). On June 3, 2024, the ALJ denied Plaintiff's application. (AR 17-30).

The ALJ applied the requisite five-step process to evaluate Plaintiff's case. (AR 18-30). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the September 22, 2022, application date. (AR 19). At step two, the ALJ found that Plaintiff has severe Wegener's granulomatosis, diabetes mellitus, rheumatoid arthritis, polycythemia, neuropathy, chronic kidney disease, and obesity. (AR 19-22). The ALJ found Plaintiff's mental impairments were nonsevere. (AR 20-22). At step three, the ALJ determined that Plaintiff's impairments did not meet or equal a listing found in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 22-23).

Next the ALJ found the Plaintiff has a residual functional capacity ("RFC")[3] for light work as defined in 20 C.F.R. § 416.967(b), limited to no exposure to hazards or climbing ladders, ropes or scaffolds, occasional exposure to uneven terrain and to atmospheric conditions (e.g., fumes, odors, dusts, mists, gases, poor ventilation, and light brighter than that typically found in an indoor work environment such as an office or retail store),

---

[3]   A residual functional capacity is what a claimant can still do despite existing exertional and nonexertional limitations. See 20 C.F.R. § 416.945(a)(1).

occasional postural activities (i.e., balancing, crawling, crouching, kneeling, stooping, climbing ramps or stairs), with the ability to wear glasses during work. (AR 24-28). The ALJ rejected Plaintiff's testimony and statements suggesting greater limits than the ALJ found to exist. (AR 24-28).

At step four, the ALJ found that Plaintiff had no past relevant work. (AR 28-29). At step five, considering Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff would be capable of performing jobs existing in significant numbers in the national economy. (AR 29-30 (adopting VE's testimony at 56-58)). The ALJ concluded that Plaintiff had not been disabled since the September 22, 2022, application date. (AR 30).

On April 8, 2025, the Appeals Council denied Plaintiff's request to review the ALJ's decision. (AR 1-3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

This Court reviews the Commissioner's decision to determine if it is free of legal error and supported by substantial evidence. See Brewes v. Comm'r, 682 F.3d 1157, 1161 (9th Cir. 2012). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill,

874 F.3d 648, 654 (9th Cir. 2017) (citation and internal quotation omitted).

To determine whether substantial evidence supports a finding, "a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion." Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (internal quotation omitted). As a result, "[i]f the evidence can support either affirming or reversing the ALJ's conclusion, [a court] may not substitute [its] judgment for that of the ALJ." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).

# DISCUSSION

Plaintiff contends that the ALJ failed to provide adequate reasons for rejecting his testimony and statements suggesting greater limitations than those in the ALJ's RFC assessment. (Pl. Brief at 4-15). After consideration of the record as a whole, the Court finds no reason to remand this matter. The ALJ's reasoning in this case is adequate, and the Court discerns no material error.[4]

---

[4] The harmless error rule applies to the review of administrative decisions regarding disability. See McLeod v. Astrue, 640 F.3d 881, 886-88 (9th Cir. 2011); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (An ALJ's decision will not be reversed for errors that are harmless).

5

**A.   Summary of the Medical Record**[5]

Plaintiff was diagnosed with granulomatosis with polyangiitis ("GPA") (formerly known as Wegener's granulomatosis)[6] in 2015, with associated joint pain and swelling, eye inflammation, distal extremity weakness/numbness from neuritis, pulmonary hemorrhage, and possible cognitive impairment. (AR 421, 1072-87). Plaintiff's GPA improved with treatment. See, e.g., AR 424, 1151, 1157 (December 2018 note reporting Plaintiff's GPA had been stable for over a year on cellcept maintenance with primarily renal involvement; his problems then included obesity with polycythemia,[7]

---

[5]   The lengthy record dates back to 2015, is largely repetitive, and contains many pages of standard patient consent forms. To put Plaintiff's allegations in context, the Court's summary focuses primarily on the record beginning one year prior to the alleged disability period at issue (i.e., starting in September 2021).

[6]   GPA is rare disease that causes swelling/inflammation of small blood vessels, mainly affecting vessels in the nose, sinuses, throat, lungs, and kidneys, but it can affect any organ.  GPA slows blood flow to some organs. Affected tissues can develop inflamed areas, or granulomas. Symptoms vary but may include fever, malaise, weight loss, muscle aches/pain, joint stiffness, sinus infections, earaches, shortness of breath, high blood pressure, leg swelling, eye pain, blurry vision, nerve damage, skin rashes, and digestive issues.   See    Granulomatosis    with    polyangiitis, https://www.mayoclinic.org/diseases-conditions/granulomatosis-with-polyangiitis/symptoms-causes/syc-20351088   (last visited May 18,   2026); see   also   Granulomatosis   with   Polyangiitis, https://my.clevelandclinic.org/health/diseases/granulomatosis-with-polyangiitis-formerly-wegeners-granulomatosis (last visited May 18, 2026).

[7]   Polycythemia is a condition marked by abnormal increase in the number of circulating red blood cells. See Polycythemia, https://www.merriam-webster.com/dictionary/polycythemia   (last visited May 18, 2026).

chronic hypertension, and non-adherence to medications); AR 1166 (May 2019 note reporting Plaintiff was asymptomatic); AR 1387 (June 2019 note reporting Plaintiff's inflammatory markers were low and Plaintiff had been asymptomatic aside from some altitude sickness when working at high altitudes); AR 1393 (December 2019 note reporting Plaintiff's inflammatory markers were low and he was asymptomatic); AR 423 (January 2020 note reporting Plaintiff was stable). By April 2020, Plaintiff's GPA with primarily pulmonary involvement was "resolved." (AR 422). He then had active nephritis,[8] moderate sleep apnea for which he eventually was prescribed a CPAP machine, and polycythemia. (AR 421-22).[9]

Plaintiff had a short hospital stay in August 2021 for COVID-19 with mild shortness of breath and diabetic ketoacidosis, with notes that Plaintiff had a history of type two diabetes and had poor compliance with taking Metformin. (AR 312-401). In December 2021, Plaintiff was still on cellcept maintenance for GPA with

---

[8]   Nephritis is acute or chronic kidney inflammation. See Nephritis, https://www.merriam-webster.com/dictionary/nephritis (last visited May 19, 2026).

[9]   Although Plaintiff's GPA initially involved joint pain and weakness, numbness, swelling in his extremities, and balance issues (see, e.g., 1105, 1110, 1120, 1122, 1125, 1238, 1244, 1251, 1256, 1287, 1330 (early records noting same; some of which may be duplicate records)), the treatment record does not reflect that those conditions persisted after Plaintiff's GPA improved. Subsequent physical examinations note normal range of motion and strength, no tenderness, no swelling, and/or normal gait. See, e.g., AR 320, 326, 740, 1044, 1077, 1155, 1163, 1166, 1170, 1174, 1180, 1187, 1194, 1201, 1206, 1211, 1224, 1230, 1239, 1243, 1246, 1263-64, 1272, 1278, 1293, 1299, 1305, 1312, 1320, 1327, 1335, 1344, 1353, 1363, 1372, 1380, 1387, 1391 (later records; some of which may be duplicate records)).

7

primarily renal involvement. (AR 557). He denied any vasculitic symptoms and was feeling well and had lost 60 pounds. (AR 557). In February 2022, Plaintiff was "doing better," trying to make healthy food choices and to exercise. (AR 587). Plaintiff had no shortness of breath and no hemoptysis.[10] (AR 587). His GPA was stable. (AR 588). Plaintiff's continued polycythemia was likely from sleep apnea. (AR 588). Plaintiff was not using his CPAP machine, which his doctor recommended he use. (AR 588). In October 2022 (one month after the disability period began), Plaintiff was still on cellcept for GPA control, he denied any new symptoms and his existing symptoms were stable, but he had uncontrolled diabetes and did not check his blood sugar often. (AR 421, 728-30).

In February 2023, Plaintiff reported he was not doing well. (AR 999). He was struggling with depression and unresolved trauma from his underlying medical condition. (AR 999-1000). He had been unable to get income, was told he did not qualify for disability benefits and was appealing. (AR 999). He reportedly was adherent with his oral medications but he did not want to take insulin and had not been taking it, and his diet was almost exclusively carbohydrates due to limited money. (AR 999-1000). His girlfriend was supporting him. (AR 999). He continued to have polycythemia from his obstructive sleep apnea due to not using his CPAP machine and severe dehydration from uncontrolled diabetes. (AR 1000). He

---

[10]   Hemoptysis is the coughing up of blood. See Hemoptysis, https://www.merriam-webster.com/dictionary/hemoptysis   (last visited May 19, 2026).

did not want medication for his depression, only therapy. (AR 1000).

In March 2023, Plaintiff had markedly increased erythrocytosis[11] and polycythemia. (AR 880). His GPA appeared to be in remission and his inflammatory markers were normal. (AR 883, 914). His "main problem" was polycythemia and uncontrolled diabetes. (AR 883, 914). He had been off his CPAP machine for two months due to life stressors, had not been able to sleep due to ruminations and restless leg syndrome, and he wanted to "hold off" from a mental health consultation until he got his "disability figured out." (AR 914). Plaintiff had missed three hematology appointments and a renal appointment, and was advised to reschedule those. (AR 914). He also was advised to check his blood sugar every morning. (AR 915).

In May 2023, Plaintiff's primary care physician, Dr. Mohamad Raad, referred Plaintiff to the emergency department for potassium and worsening kidney function with uncontrolled diabetes and dehydration. (AR 848). Plaintiff had polycythemia secondary to obstructive sleep apnea and significant dehydration from hyperglycemia for which he again was advised to use his CPAP machine and get glycemic control. (AR 849). His diabetes was uncontrolled but he reportedly had been more adherent with medication and did

---

[11]    Similar to polycythemia, erythrocytosis is an increase in the number of circulating red blood cells. See Erythrocytosis, https://www.merriam-webster.com/medical/erythrocytosis (last visited May 19, 2026).

not want to start insulin. (AR 849). His GPA was stable. (AR 849). Plaintiff reported that he had been doing well since his last clinic visit. (AR 856). The emergency department gave Plaintiff an IV solution to treat his hyperglycemia and discharged Plaintiff in stable condition. (AR 1054-59).

In July 2023, Plaintiff had a hematology visit for his polycythemia. (AR 816-17). He admittedly had stopped using his CPAP machine a year earlier and reported he sometimes felt lightheaded. (AR 816). He again was counseled on the importance of using his CPAP machine because polycythemia is likely provoked by obstructive sleep apnea, and was advised to ask his primary doctor for a more comfortable mask for his machine. (AR 817). He was treated with a therapeutic phlebotomy. (AR 777, 817).

In September 2023 and March 2024, Plaintiff continued to have uncontrolled diabetes and was nonadherent with treatment. (AR 1753, 1798, 2113-15). A November 2023 nephrology note reported that Plaintiff's kidney function was stable and Plaintiff denied any pain or discomfort and had no complaints. (AR 1914-15). He continued to have issues with appointment attendance and medication adherence. (AR 1914). He reportedly was trying to get disability and was able to do all his activities of daily living. (AR 1915). In December 2023, Plaintiff's GPA appeared to be in remission. (AR 1840). He had no complaints – he felt well, denied symptoms, had been off his CPAP machine, was missing doses of his medications, had vacationed and did not take his cellcept for a few days, and he was still using marijuana daily. (AR 1840). His "main problem"

again was polycythemia and uncontrolled diabetes. (AR 1840). Plaintiff's doctor discussed the importance of compliance with medication, using Plaintiff's CPAP machine, and checking blood sugars. (AR 1841).

There are two mental health treatment notes: (1) an intake note from May 2023, when Plaintiff reportedly was only interested in medication treatment and was scheduled for a medication evaluation in August, and (2) a follow up note for psychotherapy from April 2024. (AR 1063-70).[12] At his psychotherapy appointment, which was less than three weeks before the administrative hearing, Plaintiff reported that he was seeking services since he needed medical records for his SSI claim, he was overwhelmed with stress due to his SSI case, and he wanted to work on his post-traumatic stress disorder ("PTSD") in therapy. (AR 1063).

**The Opinion Evidence**

Consultative examiner Dr. Padma Bala provided an Independent Internal Medicine Evaluation dated November 30, 2022. (AR 737-42).

---

[12] A September 2023 primary care note reported irritability and a depression screening score of four, and noted Plaintiff was "pending SSI." (AR 2113). Plaintiff reported he was receiving mental health treatment but had to fill out new paperwork and had stopped. (AR 2113). A March 2024 primary care note states that Plaintiff was struggling with depression, using marijuana daily, and was "semi-adherent" with his oral medications. (AR 1797). Plaintiff was reluctant to follow up on resources and support, and it was noted that he would benefit from a psychiatry referral if he was amenable in the future. (AR 1798). Dr. Raad recommended that Plaintiff stop using marijuana. (AR 1798).

Dr. Bala reviewed no medical records. (AR 740). Plaintiff complained that uveitis caused him to not see very well. (AR 737). He also complained of polyarthritis and muscle pain/spasms, kidney pain, and shaking thigh muscles whenever he gets up. (AR 737-38). He reportedly had been seeing a pain management doctor. (AR 738).[13] He had worked as a plumber until June 2019. (AR 738). Mental status examination showed Plaintiff was alert and oriented, in no acute distress, and his memory appeared to be average. (AR 738). Physical examination showed 20/20 vision with glasses, unsteady gait with a weak appearance and Plaintiff walking slowly with a cane throughout the visit, normal muscle tone, mass and strength, and otherwise findings within normal limits. (AR 738-40).

Dr. Bala diagnosed autoimmune disorder, Wegener's granulomatosis, uveitis, polyarthritis, hematuria, muscle spasm, and type two diabetes. (AR 740-41). Dr. Bala opined based on objective findings Plaintiff would be able to perform light work with standing four hours a day because Plaintiff was "very weak" with decreased walking tolerance, use of a cane for any long distance walking, occasional postural activities and activities requiring agility (e.g., walking on uneven terrain, climbing ladders, or working at heights), occasional operation of heavy equipment due to his weakness and unsteadiness when standing and

---

[13]   There are no pain management treatment notes in the record.

12

walking, and with the ability to wear glasses all the time due to his uveitis. (AR 741-42).

Consultative examiner Dr. Eric Kung provided a Mental Evaluation by a Psychologist dated December 6, 2022. (AR 743-47). Dr. Kung did not review any medical records. (AR 743). Plaintiff complained of depression symptoms including poor memory and concentration for which he had not been treated. (AR 743-44). He admitted using THC daily. (AR 744). Plaintiff admitted he could manage his self care and finances, needed some assistance with household chores, running errands, shopping and cooking, enjoyed playing video games, and could drive. (AR 745). Plaintiff's posture and gait were normal. (AR 743). On mental status examination, Plaintiff had findings within normal limits except for euthymic mood and the ability to recall only two out of three items after five minutes. (AR 745-46). Plaintiff had mild difficulty interacting with clinic staff and Dr. Kung. (AR 746). Dr. Kung diagnosed major depressive disorder (moderate, recurrent), and opined that Plaintiff would have none-to-mild limitations in areas of functioning. (AR 746). Dr. Kung noted that if Plaintiff was in treatment he would significantly approve. (AR 746).

Treating physician, Dr. Mohamad Raad, provided an Auto Immune Disorder Medical Assessment Form dated March 7, 2023, indicating limitations of disabling severity. (AR 748-52). Dr. Raad had treated Plaintiff "daily" since March 2015 for GPA, polycythemia, hemorrhagic cystitis, type two diabetes, and chronic kidney disease. (AR 748). Plaintiff's symptoms included moderate

13

pain/paresthesia, chronic sinusitis, yeast infections, headaches, anxiety, disturbed sleep, renal involvement, nausea/vomiting, weight loss, depression, candida, neuropathy, and severe malaise. (AR 748).

Dr. Raad opined that Plaintiff's symptoms would interfere with Plaintiff's attention and concentration frequently, and Plaintiff could not do various activities (i.e., he could not have public contact, perform routine, repetitive tasks at a consistent pace, perform detailed or complex tasks, meet strict deadlines, do fast-paced tasks, or be exposed to work hazards). (AR 749). Dr. Raad opined that Plaintiff: (1) could lift up to 10 pounds occasionally and 20 pounds rarely; (2) could walk two blocks without rest or pain, sit for one hour at a time before needing to walk or stand, stand for one hour before needing to sit or lie down, and sit and stand/walk for a total of two hours each in an eight-hour workday; (3) would need restroom breaks eight times a day due to urinary frequency/incontinence and other breaks eight times a day due to weakness and chronic fatigue; (4) would need to rest two hours during a workday; and (5) would have environmental restrictions. (AR 749-52). Dr. Raad indicated Plaintiff would not need a cane or assistive device and would miss more than four days of work per month. (AR 751-52). Dr. Raad stated that due to Plaintiff's conditions he "has significant disability that prevents him from being gainfully employed." (AR 752).

Dr. Bala provided a second Independent Internal Medicine Evaluation dated August 30, 2023. (AR 1041-46). Dr. Bala reviewed

Dr. Raad's assessment form and her prior evaluation. (AR 1044-45). Plaintiff reportedly thought his GPA was stable, but his hemoglobin A1c was 10, he had severe pain, he could not move "that much," and had joint swelling, decreased appetite, decreased weight and depression. (AR 1042). Mental and physical examinations were unchanged from Dr. Bala's prior evaluation, except that Plaintiff ambulated with a normal gait, looked "kind of weak" and "very skinny," and had 20/30 vision with glasses. (AR 1042-44).

Dr. Bala diagnosed Wegener's granulomatosis, uveitis, rheumatoid arthritis, polycythemia, hemorrhagic cystitis, type two diabetes, high blood pressure, photosensitivity, autoimmune disease, neuropathy, and chronic kidney disease. (AR 1045). Dr. Bala opined based on objective findings that Plaintiff would be able to perform light work with standing and walking six hours a day and no need for an assistive device, noting Plaintiff was able to walk normally, and occasional activities requiring agility (e.g., walking on uneven terrain, climbing ladders, or working at heights) due to a general "appearance of weakness," and no other restrictions. (AR 1045-46).

Consultative examiner Dr. Kara Cross provided a Comprehensive Psychological Evaluation/Complete Mental Status Evaluation dated August 30, 2023. (AR 1047-51). She reviewed Dr. Kung's December 6, 2022 mental evaluation. (AR 743-47, 1047). Plaintiff complained of depression, anxiety, memory issues, irritability, moodiness, stress, anger, worry, paranoia, frustration, confusion, panic, distrust, social anxiety, PTSD (but he did not report a situation

15

or circumstance that qualified as PTSD), and reported that he used a cane (which he did not bring or use at this visit). (AR 1047-48). Dr. Cross observed Plaintiff to have a major depressive disorder, slow processing, and "vegetative signs." (AR 1047). Plaintiff admitted that he could attend to his personal care, drive, pay bills/handle cash, watch television, pick up around the house, run errands, use a microwave, use a smartphone, read, use a computer, and do art. (AR 1048). He is not always able to go out alone, is not always able to focus attention, has some difficulty completing household tasks, but no difficulty making decisions. (AR 1048). On mental status examination, Plaintiff had adequate attention and concentration, was slow to process, had a flat and anxious mood, could recall only one of three words after five minutes, and could not spell "world" backward. (AR 1049-50).

Dr. Cross diagnosed anxiety disorder (unspecified). (AR 1050). She opined that Plaintiff would have none-to-marked limitations, i.e., he would have (1) no limitations in understanding, mild limitations in remembering, and moderate limitations in carrying out simple one- or two-step task instructions over time for a 40-hour work week without emotionally decompensating; (2) mild limitations in "doing" detailed and complex tasks, but he also would have no limitations in understanding, mild limitations in remembering, and marked limitations in doing detailed and complex tasks over time for a 40-hour week without emotionally decompensating; (3) mild limitations in his ability to maintain concentration and attention; (4) moderate limitations in his ability to maintain reasonable persistence and pace, and in his

16

ability to maintain regular attendance and perform simple slow-paced tasks on a consistent basis, and marked limitations in his ability to do the same for complex or timed tasks; and (5) moderate limitations in his ability to relate to coworkers and marked limitations in his ability to relate to the public. (AR 1050-51).

A state agency physician reviewed the record in December 2022, and opined that Plaintiff would be capable of light work with occasional postural limitations, use of a cane recommended for long distance ambulation, and avoiding even moderate exposure to fumes, odors, dusts, gases, poor ventilation, etc. given Plaintiff's granulomatosis with pulmonary symptoms. See AR 88-104 (finding "not persuasive" Dr. Bala's November 2022 opinion, and "persuasive" Dr. Kung's opinion, and finding "nonsevere" Plaintiff's mental impairments). Or reconsideration in September 2023, another state agency physician agreed with the findings on initial review, but did not include a cane recommendation. See AR 105-13 (finding "persuasive" Dr. Bala's opinion August 2023 opinion, "less persuasive" Dr. Raad's opinion as unsupported by other evidence, and not persuasive Dr. Cross's opinion given Plaintiff's failure to seek mental health treatment).

**B.   The ALJ's Gave Adequate Reasons for Discounting Plaintiff's Testimony and Statements Suggesting Greater RFC Limits**

Plaintiff argues that the ALJ erred in determining his RFC by failing to give adequate reasons for discounting his testimony and statements suggesting greater limitations than the ALJ found. He

17

suggests that the ALJ did not specify how the record undermined Plaintiff's alleged limitations, and improperly relied on his activities of daily living which were not inconsistent with his testimony or statements. (Pl. Brief at 4-15 (citing, inter alia, Brown-Hunter v. Colvin, 806 F.3d 487, 494 (9th Cir. 2015)). Defendant counters that the ALJ pointed to specific inconsistencies between Plaintiff's allegations and the record to support the ALJ's decision. (Def. Brief at 2-6).

As explained below, the Court finds the ALJ's decision in this case was legally sufficient.

**1.   Plaintiff's Statements**

At the hearing in April 2024, Plaintiff testified that he was getting treatment for anxiety, PTSD, and depression, and these conditions cause him to get distracted and ruminate over past traumatic events and his physical problems. (AR 43, 45-46).[14] Plaintiff said his autoimmune disorder "heavily affects" his life — it had caused nerve damage in his hands, legs, and feet, a pulsing feeling in his back, vision sensitivity to light when his condition flares, lightheadedness, dizziness, and discomfort/pain. (AR 43-45). He said he could walk for about 30 minutes before he starts to have pain/pulsing feeling in his back and must lean on something, sit down, or take a breather for a "couple" minutes. (AR 46-47).

---

[14]   As detailed above, although Plaintiff had been referred for treatment earlier, he had just sought regular treatment that month.

He could sit for 30 minutes before he feels wobbly and unstable on his legs when he stands. (AR 47). He could focus on a task for about eight minutes or more before he starts to zone out. (AR 48). He struggles to track conversations and is "basically uncomfortable around people." (AR 49).

Plaintiff said on a typical day he takes his time getting up and leans on something until his legs are not wobbly or unstable, takes care of his personal hygiene, makes his meals, and straightens up his home and does other "simple things" around the house for up to 45 minutes at a time before he must take a break. (AR 49-51). He was living with his dad, brother, grandmother, and siblings. (AR 51-52). He said he could grocery shop once every other week for an hour with someone but he did not do much of the shopping. (AR 52). He could also drive. (AR 52). He said his medications cause him to have diarrhea, nausea, drowsiness, body aches, and lightheadedness. (AR 53). He could lift a 24-pack of water and said his lifting was "fine." (AR 54).

In an Exertion Questionnaire, Plaintiff reported that he has headaches, weakness, depression, kidney irritation, bleeding gums, fatigue, muscle spasms, and photosensitivity, and his medications cause dizziness, diarrhea, pain, and lightheadedness. (AR 244). He could do chores but he loses focus, has difficulty bending down and getting up, frequently loses his balance, and has fatigue. (AR 244). He estimated that he could walk a half mile in about 15 minutes before his chest/sides become irritated, he could lift up to 40 pounds, grocery shop once a week, do dishes in 45 minutes

19

with a break from standing, drive for about an hour before fatigue if the sun is out, and do yard work but bending down causes him lightheadedness and dizziness. (AR 244-45). When he does chores, he is slow, distracted, and irritated, and he can do them for about 25 minutes before he starts to have back/side pain, leg muscle spasms, and overthinking. (AR 246). He uses a cane for extended walking and to assist himself in getting out of cars. (AR 246).

In a Disability Report – Appeal form, Plaintiff reported he has constant pain, especially in his kidney area, is unable to sit, stand, or walk for long periods of time, is unable to stand outside in the sunlight for long periods of time, has light sensitivity, and uses a walking stick to move around. (AR 255). He also has difficulty concentrating and paces around his house. (AR 255).

In a Function Report form, Plaintiff reported that his ability to work is limited by back and leg pain, loss of balance sometimes requiring that he use a cane, social anxiety, photosensitivity, fatigue, weakness, infections due to being on immunosuppressant drugs, and lost concentration. (AR 258). He reported that he could do his own personal care, chores, and errands with breaks if needed until his side effects occur. (AR 259). He could prepare frozen food and occasionally prepare complete meals, do laundry, cleaning, and cooking, taking 3-4 hours depending on the task, go out 3-4 times a week to run errands, and grocery shop 2-3 times a week for around two hours. (AR 260-61). His hobbies included video games, crafts, television, movies, and YouTube, which he did "very often," and occasional gardening. (AR 262). He reported social anxiety and

difficulty speaking. (AR 262). He checked that his conditions affect his lifting, squatting, bending, standing, walking, kneeling, talking, seeing, memory, completing tasks, concentration, and understanding, and estimated that he could lift up to 40 pounds, and has some difficulties following written and spoken instructions. (AR 263).

### 2.   **Applicable Law**

When assessing a claimant's credibility regarding subjective pain or intensity of symptoms, the ALJ must engage in a two-step analysis. Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. Garrison, 759 F.3d at 1014. "In this analysis, the claimant is not required to show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." Id. (emphasis in original) (citation omitted). "Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof." Id. (citation omitted).

If the claimant satisfies this first step, and there is no evidence of malingering, the ALJ must provide specific, clear and convincing reasons for rejecting the claimant's testimony about the symptom severity. Id. at 1014-15; see also Robbins, 466 F.3d at 883 ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant

not credible by making specific findings as to credibility and stating clear and convincing reasons for each."). "This is not an easy requirement to meet: The clear and convincing standard is the most demanding required in Social Security cases." Garrison, 759 F.3d at 1015 (citation omitted). The ALJ must evaluate "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities for an adult." Soc. Sec. Ruling ("SSR") 16-3p, 2017 WL 5180304, at *3.

While the ALJ cannot "delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness," Trevizo, 871 F.3d at 678 n.5, the ALJ may consider "prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and the claimant's daily activities." Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation omitted). Inconsistencies between a claimant's testimony and conduct, or internal contradictions in the claimant's testimony, also may be relevant. Burrell v. Colvin, 775 F.3d 1133, 1137 (9th Cir. 2014).

In addition, the ALJ may consider the observations of treating and examining physicians regarding, among other matters, the functional restrictions caused by the claimant's symptoms. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); accord Burrell, 775 F.3d at 1137. However, it is improper for an ALJ to reject subjective testimony based "solely on a lack of objective medical

22

evidence to fully corroborate the claimant's allegations." <u>Bray v. Comm'r of Soc. Sec. Admin.</u>, 554 F.3d 1219, 1227 (9th Cir. 2009) (citation omitted); <u>see also</u> <u>Smartt v. Kijakazi</u>, 53 F.4th 489, 498 (9th Cir. 2022) (reaffirming same but observing that inconsistency with the medical evidence is a factor that can be considered; "When objective medical evidence in the record is <u>inconsistent</u> with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.") (emphasis original); SSR 16-3p, 2017 WL 5180304, at *5 ("Objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities. . .").

The ALJ must make a credibility determination with findings that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation omitted); <u>see</u> <u>Brown-Hunter v. Colvin</u>, 806 F.3d at 493 ("A finding that a claimant's testimony is not credible must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.") (citation omitted). Although an ALJ's interpretation of a claimant's testimony may not be the only reasonable one, if it is supported by substantial evidence, "it is not [the court's] role to second-guess it." <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001).

**3.    The    ALJ's    Evaluation    of    Plaintiff's    Subjective
Statements**

In determining Plaintiff's RFC, the ALJ summarized Plaintiff's testimony and acknowledged that the medical record supported "many" of Plaintiff's allegations. (AR 24-26). Regarding the record, the ALJ observed: Plaintiff was diagnosed with GPA with neuropathy in 2015, which were controlled/resolved/in remission with low inflammatory markers by 2019. (AR  25-26 (citing, e.g., AR 914, 1072, 1075, 1092-93, 1101, 1123, 1151, 1269, 1274, 1387)). Plaintiff was noncompliant with diabetes medications, and had hypertension and mild chronic kidney disease as complications. (AR 25 (citing, e.g., AR 1758, 1807, 1998)). Plaintiff had been diagnosed with rheumatoid arthritis and polycythemia, but one provider questioned Plaintiff's medication compliance given that Plaintiff's polycythemia persisted after medication was prescribed. (AR 25 (citing, e.g., AR 737, 1045, 1068, 1236, 1348)). Plaintiff was morbidly obese in 2020 with a body mass index of 47.27, but had significant weight loss and had a body mass index of 27.31 below the threshold for obesity in September 2023. (AR 25-26 (citing AR 1399, 2109)). The record supports these observations.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause many of his alleged symptoms[,]" but his "statements concerning the intensity, persistence and limiting effects of these symptoms" were "not

24

entirely consistent with the medical evidence and other evidence in the record." (AR 26). The ALJ reasoned:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, there are inconsistencies. For example, at [Dr. Bala's November 2022] consultative examination, the claimant's gait and station were unsteady. He walked slowly and [was] using his cane throughout the visit. He appeared weak. [AR 739-40]. However, at a different visit [in August 2023], a medical consultant [Dr. Bala] noted that muscle tone and mass appeared normal, with no evidence of deformities, swelling, or tenderness to direct palpation of any joint. The range of motion of all extremities appeared normal. The claimant had a normal gait and walked without any type of assistive device. [AR 1043-44]. He told a psychological consultant [Dr. Cross] that he can dress, bathe, cook, watch TV, pick up around the house, run errands, use a microwave, use a smart phone, read, and use a computer. [AR 1048]. He drove himself to the examination. [AR 1047]. There was no mention of any difficulties walking or the need of a cane.

(AR 26-27).

Earlier in the ALJ's decision, the ALJ discussed other inconsistencies between Plaintiff's allegations and the objective medical record. The record supports the ALJ's discussion. The ALJ

25

noted that while Plaintiff told Dr. Bala that his GPA resulted in uveitis causing him to not see very well (AR 737; see also AR 1068 (note reporting uveitis and photo sensitivity)), (1) it appeared his vision was corrected by glasses (AR 739, 741 (Dr. Bala stating in her first evaluation that Plaintiff was required to wear his glasses to work)), (2) at several medical appointments Plaintiff denied uveitis symptoms (AR 729, 914, 1839 (all noting same from single visit in October 2022)), and (3) Dr. Bala stated in her most recent evaluation that Plaintiff has no visual restrictions (AR 1046 (noting no restrictions even though Plaintiff has uveitis)). (AR 20).

The ALJ noted that while Plaintiff told Dr. Kung he had poor memory (AR 743), medical sources said his memory appeared to be average and/or unimpaired. See AR 21 (citing AR 738 (Dr. Bala's evaluation noting average memory); AR 1049 (Dr. Cross's evaluation noting Plaintiff was able to recall 3/3 words immediately and 1/3 after five minutes); AR 1267 (November 2019 note reporting normal immediate and short-term memory); AR 1069 (April 2024 note reporting unimpaired memory). Visit notes in 2015-2016 showed some cognitive dysfunction (AR 1071-1727), but Plaintiff's functioning had improved "notably" with more recent findings of no cognitive limitations. See AR 21 (citing AR 1799, 1842, 1917, 2039, 2115 (intake forms at visits in late 2023 and 2024 noting Plaintiff had no cognitive barriers to learning)).

The ALJ also noted that Plaintiff said he sometimes is unable to focus attention (AR 743, 1048), and when he was hospitalized

26

for GPA his attention was impaired (AR 1100), but Dr. Kung found Plaintiff had no difficulties in focusing and maintaining attention, or with concentration, persistence, and pace (AR 746), and Dr. Cross found his concentration and attention was adequate but mildly limited (AR 1049, 1051). (AR 21).

The ALJ reportedly accounted for Plaintiff's symptoms by limiting him to light work. (AR 26). The ALJ added pulmonary limitations given Plaintiff's polyangiitis, light restrictions given Plaintiff's photosensitivity, the ability to wear glasses given his vision issues, and climbing restrictions given Plaintiff's testimony that he sometimes has dizziness or lightheadedness. (AR 26). The ALJ found no cane was required for ambulation given that records after the initial state agency review showed no gait problems or need for a cane. (AR 27). The ALJ found no mental limitations given Plaintiff's lack of treatment for his anxiety and depression until April 2024. (AR 27).

4.    **Analysis**

The ALJ's reasoning in this case is sufficiently specific for the Court to determine that the ALJ discounted Plaintiff's testimony and statements on permissible grounds. Brown-Hunter v. Colvin, 806 F.3d at 493. The ALJ's reasoning for discounting Plaintiff's GPA and GPA-related symptoms appears sufficient. The ALJ could rely on the fact that Plaintiff's GPA was stable or controlled with medication or in remission long before the disability period at issue. See AR 25; see also Warre v. Comm'r of

27

Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."). As detailed above, the record since at least 2019 does not repeat the symptoms or complaints Plaintiff had when he was first diagnosed with GPA with neuropathy in 2015. The only suggestion in the record that Plaintiff may have had the symptoms he claimed since then was from Dr. Raad's evaluation form, but Dr. Raad did not comment on whether Plaintiff's symptoms persisted since Plaintiff's GPA resolved. (AR 748-52).[15]

The ALJ's reasoning for discounting Plaintiff's limitations from diabetes, polycythemia, and mental impairments is also sufficient. As the ALJ observed (AR 25), Plaintiff had been noncompliant with treatment for diabetes and polycythemia – he was not checking his blood sugars regularly, was not taking insulin, and was not using his CPAP machine. (AR 588, 816, 849, 914, 999, 1840). The ALJ found Plaintiff's mental impairments were nonsevere in part because Plaintiff did not seek regular mental health treatment despite referrals until just before the administrative hearing in this case. (AR 27). A failure to adhere to treatment sometimes can justify rejecting a claimant's subjective testimony, at least where the testimony concerns physical problems. See, e.g., Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (in assessing

---

[15]     The form Dr. Raad completed contains a "dermatomes" chart where Dr. Raad was asked to identify the location and frequency of Plaintiff's pain/paresthesia. Dr. Raad did not complete this portion of the form despite reporting that Plaintiff's symptoms included neuropathy. (AR 748-49).

the credibility of a claimant's pain testimony, the Administration properly may consider the claimant's failure to request treatment and failure to follow treatment advice) (citing Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) (en banc)); Matthews v. Shalala, 10 F.3d 678, 679-80 (9th Cir. 1993) (permissible credibility factors in assessing pain testimony include limited treatment and minimal use of medications). However, the Ninth Circuit has observed that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996) ("Nguyen") (citations and quotations omitted); see also Martinez v. Kijakazi, 2022 WL 7375569, at *2 (9th Cir. Oct. 13, 2022) (the ALJ erred in discounting claimant's allegations based on lack of treatment while failing to address evidence that lack of treatment was itself due to the claimant's mental impairment); Garrison v. Colvin, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (quoting Nguyen); accord Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) ("a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse") (internal citations and quotations omitted); Kangail v. Barnhart, 454 F.3d 627, 630 (7th Cir. 2006) ("mental illness in general. . . may prevent the sufferer from taking prescribed medications or otherwise submitting to treatment") (internal citations omitted). As detailed above, Plaintiff reported that he sought mental health treatment to support his SSI claim. (AR 1063). On this record, the ALJ's reliance on Plaintiff's failure to follow prescribed treatment for his

29

diabetes and polycythemia and failure to seek mental health treatment to discount Plaintiff's subjective statements was proper.[16]

The ALJ's general reasoning for discounting Plaintiff's statements suggesting greater limitations than the ALJ assessed based on inconsistencies with the medical record is also adequate. Smartt v. Kijakazi, 53 F.4th at 498; SSR 16-3p, 2017 WL 5180304, at *5; see also Nadon v. Bisignano, 145 F.4th 1133, 1137 (9th Cir. 2025) (finding ALJ's reasoning adequate for discounting claimant's testimony where the ALJ summarized the testimony and identified inconsistencies; distinguishing Brown-Hunter v. Colvin, 806 F.3d at 493-94). As discussed above, the record supports the inconsistencies the ALJ cited. The Court notes (as the ALJ noted (AR 26-27)), Plaintiff presented to Dr. Bala with a cane and weak appearance on November 30, 2022 (AR 738-40), and presented to Dr. Kung with normal gait and posture without using a cane on December 6, 2022 (just a week later) (AR 743-45). Without any evidence in the record to suggest that Plaintiff's symptoms waxed and waned, or to explain how his symptoms may or may not show up when his GPS is considered "in remission," there is no apparent explanation for this discrepancy.

---

[16]   Even if Plaintiff's noncompliance with treatment should not have been considered given Plaintiff's alleged mental impairments, the ALJ's remaining reasons for discounting Plaintiff's statements justify the ALJ's decision.

The ALJ also appears to have relied on Plaintiff's admitted daily activities to discount his statements. An ALJ may rely on a claimant's daily activities in discounting symptom testimony. See Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (daily activities may be used to discount subjective complaints where the daily activities "contradict [a claimant's] other testimony" or "meet the threshold for transferrable work skills"); see also Ghanim v. Colvin, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."); Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (daily activities have bearing on a claimant's credibility where the "level of activity [is] inconsistent with the Claimant's claimed limitations"). Here, the fact that Plaintiff admitted to Dr. Cross that he could drive, dress, bathe, cook, watch TV, pick up around the house, run errands, use a microwave, use a smart phone, read, and use a computer, and was not using a cane at that appointment, may suggest that he was not as limited as he alleged. See Valentine v. Comm'r, 574 F.3d 685, 693 (9th Cir. 2009) (while daily activities did not suggest Plaintiff could return to his prior work, they did suggest that his "later claims about the severity of his limitations were exaggerated"). The Court need not decide whether this reason was adequate given the adequacy of the ALJ's remaining reasons. The infirmity of one or two stated reasons for an ALJ's credibility determination would not require this Court to overturn the ALJ's determination, since the ALJ stated other independently valid reasons for discounting Plaintiff's statements. See Carmickle v. Comm'r, 533 F.3d 1155, 1162 (9th Cir. 2008).

The ALJ's reasoning is sufficiently specific for the Court to conclude that the ALJ did not arbitrarily discount Plaintiff's testimony. The ALJ adequately explained why the record did not support Plaintiff's claimed limitations. Compare Brown-Hunter, 806 F.3d at 491 (finding fault with ALJ's conclusion that the claimant's limitations were less than alleged where the ALJ merely summarized the medical record without explaining why it undermined the claimant's allegations).

Because the ALJ discounted Plaintiff's testimony on legally permissible grounds and the ALJ's reasoning is supported by substantial evidence, the Court will defer to the ALJ's interpretation of the evidence. See Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1464 (9th Cir. 1995) (court will defer to an ALJ's credibility determinations when they are appropriately supported in the record by specific findings justifying the decision).

**ORDER**

For the foregoing reasons, the decision of the Commissioner is affirmed.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June 1, 2026

_____/s/_____
                ALKA SAGAR
    UNITED STATES MAGISTRATE JUDGE